# JOHN HOCH v. H. E. BYRAM AND OTHERS.[1]

May 9, 1930.

No. 27,711.

[1]Reported in 230 N. W. 823.

*F. W. Root, C. O. Newcomb, A. C. Erdall* and *Webber, George & Owen,* for appellants.

*Tautges, Wilder & McDonald,* for respondent.

HOLT, J.

Defendants appeal from the order denying their motion for a new trial.

Defendants as receivers were operating the Chicago, Milwaukee & St. Paul Railway Company, when plaintiff, employed as fireman in the operation of an interstate freight train, was injured as hereinafter stated. The company was not a domestic corporation but owned and operated an extensive railway system in and through this and neighboring states. The accident took place shortly after noon October 16, 1927, in the airline yard of the company, at Milwaukee, Wisconsin.

The train on which plaintiff then was fireman was just pulling out from track No. 17 of the yard onto the easterly lead, destined for Savanna, Illinois. The engineer, plaintiff and the head brakeman were in the cab of the locomotive. As the locomotive approached the switch to the lead the crew got a signal from the switchman in charge of the easterly lead to make an emergency stop, but they were unable to stop clear of the lead, and before the train could be moved back the corner or cab of the locomotive was struck by a string of five loaded box-cars that came down the lead unattended. The cab was forced against the boiler, some pipes carrying live steam were broken, and the escaping steam seriously burned the three men before they could escape from the debris. The reason for the five cars coming down the easterly lead of the yard with no one in control at the brakes was this:

This yard consists of some 24 tracks holding variously from 35 to 65 cars. These tracks are entered from the westerly lead, and the cars placed thereon are pulled from the easterly lead. The westerly lead is so constructed that a few hundred feet before the switch for No. 1 track is reached there is a hump some 12 or 14 feet higher than the lowest point of the yard. The approach to the hump from the west is up grade. The top of the hump is level for about 40 feet. In other words, this appears to be a gravity switch track for the distribution of strings of cars upon the different tracks, and the manner of operation is this:

At the hump is a man in charge called the pin puller, who cuts off the car or cars to be run in on a particular track. He also signals the switchman in charge of the lead what switch to open. As the train is shoved up the hump very slowly one of the so-called hump riders mounts the car or cars to be cut off to control the speed and to stop and set the brakes at the proper place on the track to be entered. When that is done he has to walk back to the hump. This takes considerable time, and as each train or string of cars to be distributed may have many cars destined for many different tracks, there are sometimes up to 14 hump riders. When heavy cuts or some box-cars and some gondolas or flat-cars are in the same cut

more than one hump rider mounts because it is necessary to set more than one brake, and speedy work at more than one brake may be needed depending on the track's being dry or slippery. If only one car is to be cut off there is slack so that the pin may be pulled before it goes over the hump; but after several cars go over the hump together the hump rider has to set the brakes so that there may be sufficient slack to lift the pin at the cut.

At the particular time in question the end of the train being shoved up the hump had five box-cars loaded with wheat which were to be put in on track No. 24. Hump rider Voros, when mounting the cars, was told by pin puller Geiger that they were destined for track No. 24 and that it was clear. That meant that there were no other cars on that track and that they should be stopped and the brakes set so as to clear the east lead by a car length or two. Voros set the brake on the head car and walked over to the westerly end of the second car, where its brake was, to apply it, but claims it turned the wrong way for the dog or ratchet to hold. While having this difficulty he mistakenly thought he saw the switch open for track No. 23, which was filled with cars, and apprehending a collision he slid down and off the cut. He had no more than got to the ground before he discovered his error and tried to overtake the cars but failed. He called to a lead switchman near the switch shanty to notify the switchman on the easterly lead of the mishap. This was done by telephone; but, as already stated, the collision could not be averted.

There are several assignments of error that do not go to the merits of plaintiff's cause of action or the amount of the verdict. Of these the two main contentions are that to allow plaintiff, a resident of the state of Wisconsin, to try this action growing out of the accident occurring in the state of plaintiff's domicile imposes an undue burden upon interstate commerce, and that the district court of Winona county is forum non conveniens. Both of these contentions have been so fully considered by this court in the recent cases of Erving v. C. & N. W. Ry. Co. 171 Minn. 87, 214 N. W. 12, and Boright v. C. R. I. & P. Ry. Co. 180 Minn. 52, 230 N. W. 457,

that we deem them settled, until the Supreme Court of the United States, the final authority, decides otherwise.

Various motions for continuances and dismissal and also rulings against defendants arose out of this situation: After this action was begun plaintiff gave notice to take the depositions of several witnesses at Milwaukee, Wisconsin; but before the date fixed for taking the same, defendants began an action in the court of Wisconsin against plaintiff, one of his attorneys, and the several witnesses named in the notice to take depositions to enjoin plaintiff and his attorney from attempting to take the depositions and commanding the witnesses to refrain from giving testimony by deposition or otherwise in this plaintiff's action. A temporary restraining order was issued. On the hearing a temporary injunction was denied; but, on a bond being given, the restraining order was kept in effect pending an appeal to the supreme court of Wisconsin, which court had rendered no decision when the trial of this action took place.

That this situation created by appellants should afford them no just cause for a continuance is too obvious for argument. Even though the lower court in Wisconsin had denied an injunction, its favor in keeping the temporary restraining order in force pending the appeal is claimed to be an adjudication entitled, under art. IV, § 1, of the federal constitution, to full faith and credit and a bar to the trial of this action in the court below. Without stopping to consider whether a temporary restraining order can be an adjudication covered by the full faith and credit clause mentioned, we think our decisions go to the length that even if the injunction suit in Wisconsin had been determined on its merits in favor of appellants (which it was not) the judgment therein would not have prevented the trial of this case. State ex rel. Bossung v. District Court, 140 Minn. 494, 168 N. W. 589, 1 A. L. R. 145; Union Pacific R. Co. v. Rule, 155 Minn. 302, 193 N. W. 161; State ex rel. Collins v. District Court, 176 Minn. 636, 222 N. W. 931. The case of C. R. I. & P. Ry. Co. v. Schendel, 270 U. S. 611, 46 S. Ct. 420, 70 L. ed. 757, 53 A. L. R. 1265, is not in point for there the Iowa adjudication was upon the cause of action sued on in this state. The restraining order here

involved adjudged nothing in respect to this plaintiff's cause of action. We see nothing in the Wisconsin suit or in its pendency upon which defendants can predicate reversible error on this appeal.

Plaintiff claimed that the negligence of Geiger, the pin puller, and of Voros, the hump rider, caused the collision. A witness who had experience in both positions was called to give an opinion as to whether or not one rider was sufficient for five loaded cars. Objection was made to a hypothetical question on that subject on the ground, among others, that "it leaves out matters that the witness must know before he can answer any such question." There was no suggestion in respect to what essentials were omitted. But aside from that, no prejudice could result to defendants, for the court limited the issue of negligence to the acts and omissions of their employe Voros alone.

Complaint is made that a medical expert for plaintiff was permitted to give his opinion that plaintiff would not be able to work as fireman or engineer and should not be required to do such work. It seems to us that the physical injuries were such that medical experts who had examined plaintiff could aid a jury in determining to what extent he had been incapacitated from engaging in certain vocations. Defendants also adduced medical opinions on the same subject contradicting those of plaintiff. There was no error here.

To account for the absence of the witnesses who had been restrained from testifying defendants offered the restraining order of the Wisconsin court above referred to. When the offer was made counsel for plaintiff stated: "We have no objection to letting the record show that the railroad company started suit and prevented the witnesses coming here, and for that purpose only." At this point the court directed that further discussion of the offer be made in the absence of the jury, and after some five pages thereof the title of the Wisconsin action and the main part of the restraining order were received in evidence, both parties agreeing thereto. From that part so received it clearly appears that the Wisconsin suit was instituted by defendants, and the remarks of the counsel above quoted could not possibly be regarded as misconduct. They

merely stated what the parties, after a parley not in the presence of the jury, directly consented the jury should know.

The troublesome question in the case is the amount of the verdict. The record indicates a careful and fair trial. There is nothing which could have excited the passion or prejudice of the jury. But comparing the damages here awarded with those given where a person has lost limbs or been rendered helpless for life, we must hold that they are too excessive to stand. The learned trial court is correct when he says:

"I believe that plaintiff's witnesses have exaggerated. I do not believe that there is anything wrong with his heart or his lungs or his hearing, or that he is unable to do manual labor. On the other hand, I do not believe that he will ever be able to resume his former occupation or any work of a similar nature. This terrible experience, it seems to me, must have unnerved him for any such employment. I am inclined to regard his impaired morale as a more serious disability than his physical condition."

Plaintiff's weight before the accident was 180 pounds. It was only six pounds less at the trial. It is true his body, as indicated by the photographs introduced by him, shows extensive scars from burns and also on his face, particularly the lips and the upper edge of his ears; but at that he appears a rather good-looking man. We do not minimize his injuries or sufferings; but in view of our conclusion that this verdict is so large that a new trial should be had, we refrain from further discussion of the evidence bearing upon damages. The verdict was for $34,963, concurred in by 11 jurors. It should also be considered that defendants paid for all of the doctor's services and hospital expenses plaintiff received for some five months, and from the time of the accident until the commencement of this action paid him $1,400, at the rate of $150 a month. Instead of attempting to reduce the verdict we deem it best that the damages be submitted to another jury.

Counsel for defendants, apparently in good faith, thought the Wisconsin proceeding was effective for some purpose, at least so as to make it improper to have at the trial the witnesses who had been

restrained from testifying. Therefore Dr. O. R. Lillie, who had treated plaintiff during his stay at the hospital and therefore was better qualified than any other medical expert to aid the jury on the question of damages, was not heard. We are not inclined to place serious consequences upon a client for an error of his counsel if it can be avoided. In the instant case there is such a clear right of recovery under the federal employers liability act for the negligence of plaintiff's fellow servant Voros that no issue but damages need be retried. There was no attempt to prove negligence of plaintiff or assumption of risk, nor any suggestion in the evidence that such defenses might exist.

The order is reversed and the case remanded with directions to grant a new trial on the issue of damages alone.

DIBELL, J. (dissenting).

I agree that liability was proved. I do not think the verdict excessive and prefer that it stand without a new trial and to that extent dissent.

